[No. S027255. Oct. 31, 1994.]

COLLEGE HOSPITAL, INC., Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
LAURA DIANE CROWELL et al., Real Parties in Interest.

## COUNSEL

Madory, Booth, Zell & Pleiss, Madory, Zell & Pleiss, Larry T. Pleiss, Horvitz & Levy, Ellis J. Horvitz, Daniel J. Gonzalez and S. Thomas Dodd for Petitioner.

Munger, Tolles & Olson, Allen M. Katz, Jeffrey L. Bleich, Chapman, Popik & White, Susan M. Popik, Nance F. Becker, Thelen, Marrin, Johnson & Bridges, Curtis A. Cole, Michael D. Holtz and Fred J. Hiestand as Amici Curiae on behalf of Petitoner.

No appearance for Respondent.

John A. Luetto, Murtaugh, Miller, Meyer & Nelson, Michael J. Murtaugh, Lana Feldman and Susan Westover for Real Parties in Interest.

Houck & Balisok, Russell S. Balisok, Shernoff, Bidart & Darras, William M. Shernoff and Sharon J. Arkin as Amici Curiae on behalf of Real Parties in Interest.

## OPINION

**BAXTER, J.**—We focus for the second time in two years on Code of Civil Procedure section 425.13, subdivision (a) (section 425.13(a)).[1] This section bars inclusion of a punitive damages claim in certain actions against health care providers unless the plaintiff first demonstrates a "substantial probability" that he "will prevail" on the claim. In *Central Pathology Service Medical Clinic, Inc.* v. *Superior Court* (1992) 3 Cal.4th 181 [10 Cal.Rptr.2d 208, 832 P.2d 924] (*Central Pathology*), we determined the actions to which the statute applies—those involving the quality and nature of health services. We now decide the legal standard to be applied in determining whether the statutory requirement has been met. We also determine whether the statute was correctly applied to the facts of this case.

Although the language of section 425.13(a) is uncertain, its prophylactic purpose is clear—to protect health care providers from the onerous burden of defending against meritless punitive damage claims. We hold that the statute achieves this goal by requiring the plaintiff to both state and substantiate a legitimate, triable punitive damages claim. On the other hand, contrary to defense arguments in this case, section 425.13(a) does not authorize the trial court to reject a well-pled and factually supported punitive damages claim simply because the court believes the evidence is not strong enough for probable success before a jury.

The substantive requirements for recovering punitive damages are set forth in Civil Code section 3294. In determining whether the plaintiffs in this case have stated and substantiated a triable punitive damages claim, we will examine some of these requirements, including, in particular, the limits on an employer's liability for such damages based on the "malicious" acts of an employee.

Here, a hospital outpatient receiving treatment for certain mood disorders claims she was traumatized when her extramarital affair with a hospital employee ended. The employee was not involved in the patient's treatment. The patient and her spouse sued the hospital for breach of therapeutic duty and were allowed to plead a punitive damages claim in the trial court. The Court of Appeal upheld this ruling. We conclude the lower courts erred in allowing a punitive damages claim to be stated under the particular circumstances. The judgment will be reversed.

### FACTS

Laura Crowell, an attorney, is married to Richard Crowell. In 1991, the Crowells filed a complaint stating various causes of action against College

---

[1]All further unlabeled statutory references are to the Code of Civil Procedure. Other codes, such as the Civil Code, will be named.

Hospital, a corporation (Hospital).[2] Certain administrators, psychotherapists, and other health professionals employed by the Hospital were also individually named as defendants. For procedural reasons that will become clear, only the Hospital is a party to proceedings in this court.

The unverified complaint is no model of clarity. Distilled, it alleges the following facts as to all counts: In 1990, Laura sought outpatient treatment from the Hospital for agoraphobia and other panic disorders. She attended psychotherapy sessions during the day and returned home at night. Shortly after her treatment began, Laura met Robert Berry. Berry worked in the cardiopulmonary unit of the Hospital.

Laura became involved in an extramarital affair with Berry. In the words of the complaint, Berry "manipulated" Laura into giving him sex, money, and gifts. Hospital therapists allegedly "encouraged" Laura to accept Berry's advances. When he ended the relationship, she suffered a "breakdown" and was admitted to another psychiatric institution. Therapists employed by the Hospital thereafter "abandoned" Laura as a patient. Richard purportedly suffered emotional distress when he learned of his wife's affair.

The Hospital is essentially charged with breach of a duty to provide competent therapeutic care. As to all counts, the complaint alleges that the Hospital knew about Berry's prior sexual relationship with another patient, knew about the relationship between Laura and Berry, and knew or should have known that Laura would suffer mental injury as a result. Aside from one instance in which the Hospital's administrator (Ken Westbrook) warned Berry against patient contact, the Hospital allegedly failed to discipline Berry or otherwise intervene in his relationship with Laura. Plaintiffs also claim they were not warned of Berry's "unfortunate propensities."

Based on the foregoing allegations, the complaint pleads a cause of action for professional negligence against all defendants, including the Hospital. Intentional and negligent infliction of emotional distress counts are also pled against the Hospital and Berry. As originally filed, the complaint prayed for punitive damages against the Hospital and Berry. These two defendants moved to strike the punitive damage allegations on the ground that plaintiffs

[2]The Hospital informs us that it was "erroneously sued" as College Hospital, Inc., and that the correct name is CHCM, Inc., doing business as College Hospital of Costa Mesa. The parties have apparently agreed to amend the pleadings below to correct the error. For consistency's sake, however, we will identify the Hospital by the name used in the trial court and Court of Appeal. (See, e.g., *Western Oil & Gas Assn.* v. *Monterey Bay Unified Air Pollution Control Dist.* (1989) 49 Cal.3d 408, 411, fn. 1 [261 Cal.Rptr. 384, 777 P.2d 157].) Unlike the Court of Appeal, we see no reason to abbreviate plaintiffs' last name or otherwise conceal their identities. (See Cal. Style Manual (3d ed. 1986) § 213, p. 146.)

had not complied with the requirements of section 425.13(a). The court granted the motion to strike.

Plaintiffs timely moved under section 425.13(a) for an order allowing them to amend the complaint to state a punitive damages claim against the Hospital and Berry. Attached to the motion was a declaration executed by Laura, as well as a proposed first amended complaint that is identical to the original complaint in most respects. In particular, the proposed amended complaint alleges that the Hospital and Berry acted with "oppression, fraud, and malice," and seeks punitive damages against them in conjunction with the intentional-infliction count. The Hospital and Berry formally opposed the section 425.13(a) motion, and plaintiffs filed a written reply. Additional evidence was submitted with the opposing and reply papers.[3]

At the section 425.13(a) hearing, plaintiffs basically argued that the proposed punitive damages claim should be allowed against Berry under section 425.13(a) because his relationship with Laura was malicious and harmful. Plaintiffs also proposed three theories on which the Hospital could be held liable for punitive damages: (1) Berry was a management-level employee who committed malicious acts against Laura, (2) Westbrook, the highest ranking manager at the Hospital, investigated and otherwise handled the Laura-Berry relationship in a malicious way, and (3) Westbrook ratified Berry's malicious conduct towards Laura.

The trial court granted the section 425.13(a) motion and allowed plaintiffs to amend their complaint to state a punitive damages claim against the Hospital and Berry. The Hospital alone petitioned for a writ of mandate to set aside the ruling. The Court of Appeal summarily denied relief. We granted the Hospital's petition for review and transferred the matter to the Court of Appeal with directions to issue an alternative writ.

In its opinion, the Court of Appeal interpreted section 425.13(a) in a manner largely consistent with other courts considering the same or similar statutes. (See *Aquino* v. *Superior Court* (1993) 21 Cal.App.4th 847, 853-856 [26 Cal.Rptr.2d 477] [§ 425.13(a)]; *Looney* v. *Superior Court* (1993) 16 Cal.App.4th 521, 537-539 [20 Cal.Rptr.2d 182] [same]; *Rowe* v. *Superior Court* (1993) 15 Cal.App.4th 1711, 1718-1724 [19 Cal.Rptr.2d 625] [§ 425.14]; *Hung* v. *Wang* (1992) 8 Cal.App.4th 908, 926-934 [11 Cal.Rptr.2d 113] [Civ. Code, § 1714.10].) The court concluded that a complaint governed by section 425.13(a) cannot be amended to seek punitive

---

[3]In support of the section 425.13(a) motion, plaintiffs submitted Laura's declaration, the declaration of a retained expert, and excerpts from the deposition testimony of administrator Westbrook. In opposition, the defense presented a declaration by its own expert, as well as brief excerpts from the depositions of Laura, hospital therapists, and Berry.

damages absent a competent "prima facie" showing of a viable punitive damages claim. Plaintiffs had satisfied this requirement, the court ruled, by presenting evidence supporting each theory of punitive damages liability proffered against the Hospital. The court denied the Hospital's writ petition and discharged the alternative writ. We granted review.

DISCUSSION

## A. Punitive Damages Overview

■ The civil law is normally concerned with compensating victims for actual injuries sustained at the hands of a tortfeasor. Punitive damages are an exception to this rule. Since 1872, they have been statutorily authorized in actions "not arising from contract" where the tortious event involves an additional egregious component—"oppression, fraud, or malice." (Civ. Code, § 3294, subd. (a).) Punitive damages are to be assessed in an amount which, depending upon the defendant's financial worth and other factors, will deter him and others from committing similar misdeeds. (*Adams* v. *Murakami* (1991) 54 Cal.3d 105, 110-111 [284 Cal.Rptr. 318, 813 P.2d 1348].) Because compensatory damages are designed to make the plaintiff "whole," punitive damages are a "windfall" form of recovery. (*Id.*, at p. 120.)

For more than a century, the punitive damages scheme remained unchanged. In recent years, however, the Legislature has made it more difficult for plaintiffs to plead and prove such claims.

Beginning in 1979, various procedural restrictions were enacted. ■ The Legislature limited the circumstances under which evidence of the defendant's financial condition could be discovered and admitted, authorized bifurcation of the punitive damages phase of trial, and barred disclosure of the amount of punitive damages sought in the complaint. (Civ. Code, § 3295, subds. (a)-(e).) These provisions were apparently intended to curtail use of such claims as a tactical ploy. The pretrial discovery limits ensure that defendants are not coerced into settling suits solely to avoid unwarranted intrusions into their private financial affairs, while the evidentiary restrictions minimize potential prejudice to the defense in front of a jury. (See *Rawnsley* v. *Superior Court* (1986) 183 Cal.App.3d 86, 90-91 [227 Cal.Rptr. 806]; *Cobb* v. *Superior Court* (1979) 99 Cal.App.3d 543, 550 [160 Cal.Rptr. 561]; *Richards* v. *Superior Court* (1978) 86 Cal.App.3d 265, 270-271 [150 Cal.Rptr. 77].)

In 1980, the Legislature began modifying the substantive elements of punitive damage awards. It limited the circumstances under which an employer could be held liable for punitive damages "based upon acts of an

employee." (Civ. Code, § 3294, subd. (b).) At the same time, the concepts of "oppression," "fraud," and "malice" were given specific definitions. (*Id.*, § 3294, subd. (c).) Perhaps not coincidentally, such topics had been addressed by this court the previous year. (See *Taylor* v. *Superior Court* (1979) 24 Cal.3d 890 [157 Cal.Rptr. 693, 598 P.2d 854] [malice]; *Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809 [169 Cal.Rptr. 691, 620 P.2d 141] [employer liability].)

Additional requirements were imposed by the Willie L. Brown, Jr.-Bill Lockyer Civil Liability Reform Act of 1987 (1987 Reform Act or Act). (Stats. 1987, ch. 1498, §§ 1-7, pp. 5777-5782.) As noted in *Central Pathology, supra*, 3 Cal.4th 181, 188, the Act amended Civil Code section 3294 by increasing the plaintiff's burden of proving punitive damages at trial to "clear and convincing evidence." The definition of "malice" was also refined. For plaintiffs attempting to prove malice by showing a "conscious disregard" of their rights as opposed to an actual intent to harm, the Act imposed additional requirements of "despicable" and "willful" defense conduct.

The 1987 Reform Act also added section 425.13 to the Code of Civil Procedure. As we will explain, the statute imposes certain pretrial procedural requirements on plaintiffs attempting to plead a punitive damages claim against a health care provider. It is not the only statute of its kind. Between 1988 and 1992, several similar provisions, covering both compensatory and punitive damage claims, were added to the Code of Civil Procedure. (§§ 425.14 [punitive damages claim against religious corporation], 425.15 [negligence claim against volunteer director or officer of nonprofit corporation], 425.16 ["SLAPP" suit affecting right of petition/free speech]; see also Civ. Code, §§ 1714.10 [conspiracy claim against attorney], 3295, subd. (c) [discovery in punitive damages action].)

## B. *Section 425.13(a) and Central Pathology*

Section 425.13(a) provides: "In any action for damages arising out of the professional negligence of a health care provider, no claim for punitive damages shall be included in a complaint or other pleading unless the court enters an order allowing an amended pleading that includes a claim for punitive damages to be filed. *The court may allow the filing of an amended pleading claiming punitive damages on a motion by the party seeking the amended pleading and on the basis of the supporting and opposing affidavits presented that the plaintiff has established that there is a substantial probability that the plaintiff will prevail on the claim pursuant to Section 3294 of the Civil Code. . . .*" (Italics added.) Subdivision (a) also contains time limits for filing such motions (i.e., no more than two years after the complaint is filed or not less than nine months before trial, whichever occurs first).

This court examined section 425.13(a) for the first time in *Central Pathology, supra,* 3 Cal.4th 181. There, we were primarily concerned with the meaning of the vague triggering phrase, "[i]n any action for damages arising out of the professional negligence of a health care provider." Before *Central Pathology* was decided, some courts had assumed that the statute uses "negligence" in its strict legal sense, and that it does not cover allegations of intentional wrongdoing. In *Central Pathology* itself, the lower courts failed to apply section 425.13(a) to a patient who sued her physician and laboratory for fraudulently communicating the results of medical tests.

We rejected this approach. The legislative history made clear that the statute applies when punitive damages are sought for any misconduct "directly related to the professional services provided by the health care provider." (*Central Pathology, supra,* 3 Cal.4th at p. 191.) We emphasized that the primary purpose of section 425.13(a) was to establish a pretrial mechanism that bars " 'unsubstantiated' " punitive damage claims brought against health care providers " 'in their [professional] capacity.' " (3 Cal.4th, *supra,* at p. 189.) An interpretation of the statute restricting its applicability to nonintentional tort claims "is inconsistent with the intention of the Legislature to protect health care providers from frequently pleaded and frivolous punitive damage claims." (*Id.* at p. 191.) Because the intentional misconduct alleged in *Central Pathology* concerned the manner in which medical services were performed, the plaintiff should have been required to comply with section 425.13(a).

Here, there is no dispute that the punitive damages claim "directly relates" to services rendered by the Hospital, a health care provider. Our task is to determine the type of pleading hurdle presented, and whether its requirements have been met in this case.

C. *"Substantial Probability" Under Section 425.13(a)*

The Hospital and its amici curiae[4] insist the Court of Appeal erred by not construing section 425.13(a) to contain a rigorous "weighing" test. They argue that the statute not only disallows punitive damage claims that obviously lack merit, but also requires the court to assess the relative merits of a claim and to bar any punitive damages claim that does not appear highly likely to succeed at trial.

---

[4]Amicus curiae briefs in support of the Hospital have been filed by the Association for California Tort Reform and State Farm Fire & Casualty Company. Joint amicus curiae briefs have also been filed on Hospital's behalf by the (1) American Insurance Association and National Association of Independent Insurers, and (2) California Medical Association, California Dental Association, and California Association of Hospitals and Health Systems. Amicus curiae briefs in support of plaintiffs have been filed by Victims of Insurance Company Errors and California Advocates for Nursing Home Reform.

A superficial reading of the statute might support this view. Section 425.13(a) speaks in terms of "a substantial probability" that the punitive damages claim "will prevail" under Civil Code section 3294. The noun "probability" commonly suggests a relative likelihood that a particular outcome will occur. By referring to whether the claim "will prevail," the statute might be read to require an assessment of the plaintiff's chances of recovering punitive damages at trial. Further narrowing of the class of permissible claims might be inferred from use of the adjective "substantial" to qualify "probability."

Read in context, however, the statutory language hardly compels this unusual interpretation. Section 425.13(a) does not expressly instruct the trial court to "weigh" evidence or make an "independent" assessment of its relative strength. The "affidavit" format described by the statute is a truncated one, reminiscent of summary judgment procedure. It is not well suited to predicting how the jury would react to a full-blown case at trial.

The phrase "substantial probability," standing alone, is particularly ambiguous. These and similar words are widely used in California law under circumstances which indicate that their meaning depends entirely upon the particular context.

■ For example, trial error is usually deemed harmless in California unless there is a "reasonabl[e] probab[ility]" that it affected the verdict. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) We have made clear that a "probability" in this context does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*. (*Id.*, at p. 837; cf. *Strickland* v. *Washington* (1984) 466 U.S. 668, 693-694, 697, 698 [80 L.Ed.2d 674, 697-700, 104 S.Ct. 2052] ["reasonable probability" does not mean "more likely than not," but merely "probability sufficient to undermine confidence in the outcome"].) ■ By the same token, a judgment will not be disturbed for lack of evidence if the evidence in support of the judgment is "substantial," that is, enough to *allow* a reasonable jury to have reached the challenged result. (*Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].) On the other hand, the trial court may indeed have to predict a "reasonable probability" of success *on the merits* before granting the extraordinary remedy of a preliminary injunction. (*Continental Baking Co.* v. *Katz* (1968) 68 Cal.2d 512, 528 [67 Cal.Rptr. 761, 439 P.2d 889].)

Similar flexibility appears in the Legislature's historical use of the "substantial probability" standard. The phrase is included in at least 30 provisions, most of which have nothing to do with civil pleading matters. (See,

e.g., Evid. Code, § 1062, subd. (a) [trade secrets/closed hearing]; Gov. Code, §§ 8670.56.6, subd. (k)(2)(A) [oil spills/immunity], 37606, subd. (c)(2) [municipal hospitals/meetings]; Health & Saf. Code, §§ 1325 [long-term care facilities/receivership], 4038 [safe drinking water/penalties], 42301.7 [air pollution control/powers]; Lab. Code, § 1288, subd. (a) [employment/citations]; Pen. Code, § 859.1, subd. (b)(6) [minor victim/closed hearing]; Wat. Code, § 13304, subd. (e) [water pollution/remedies]; Welf. & Inst. Code, § 366.21, subd. (g)(1) [dependency hearing/custody].) Frequent use of the "substantial probability" test for such diverse purposes suggests that—whatever specific meaning it has acquired in a particular context—the Legislature has assigned it no uniform interpretation.

By the same token, other statutes which *do* seem closely related to section 425.13(a) contain slightly varying expressions of the test for "pleadability." (§§ 425.14 [plaintiff must "substantiate" punitive damages claim against religious corporation], 425.15, subd. (a) [same as to negligence claim against volunteer director or officer of nonprofit corporation], 425.16, subd. (b) [plaintiff must show "probability" of success on "SLAPP" suit]; see also Civ. Code, §§ 1714.10, subd. (a) [plaintiff must show "reasonable probability" of success on conspiracy claim against attorney], 3295, subd. (c) [plaintiff must show "substantial probability" of success on punitive damages claim before discovering financial information].) It seems unlikely that each subtle difference in phraseology was intended to establish a completely different legal standard. In any event, we will see that most of these statutes were patterned upon section 425.13(a) and have similar purposes.

■ Finally, if the Legislature literally intended section 425.13(a) to prevent trial of all but the most compelling punitive damage claims, means were available to make that purpose unmistakably clear. As suggested earlier, the Legislature could simply have specified that the trial court was to "weigh" the available evidence and independently determine whether the plaintiff is "more likely than not" to prevail, win, or obtain a favorable judgment at trial. (Cf., e.g., §§ 405.3 ["probable validity" in lis pendens law means claimant is "more likely than not" to obtain judgment], 631.8, subd. (a) [court "weighs" evidence in nonjury trial].) The Legislature did not exercise that option.

For the foregoing reasons, we find the language of section 425.13(a) ambiguous insofar as it purports to articulate a "substantial probability" of success standard for assessing the "pleadability" of punitive damage claims against health care providers. We must therefore interpret the section in a commonsense manner consistent with its underlying purpose. We identify such purpose by examining the statutory scheme of which section 425.13(a)

is a part, as well as the legislative history of this statute. (See, e.g., *Central Pathology, supra*, 3 Cal.4th 181, 188.)

Except insofar as it increased the burden of proof applicable in *all* punitive damage trials, nothing in the 1987 Reform Act indicates that the Legislature intended to change the substantive elements of punitive damage claims against health care providers or otherwise narrow the class of plaintiffs entitled to recover such damages. The Legislature could have amended Civil Code section 3294 to reflect such changes in medical malpractice actions, but it did not do so. When adding section 425.13(a) to the Code of Civil Procedure, the Legislature placed it near other statutes long used by courts to screen the legal sufficiency and triability of claims before trial. (See §§ 430.10 [demurrer], 436-437 [motion to strike], 437c [summary judgment].)

Much like these other pretrial mechanisms, section 425.13(a) concerns the threshold question whether a claim can be *pled* by the plaintiff. By its own terms, section 425.13(a) requires the plaintiff to specially move to amend the complaint at a fairly early stage in the lawsuit. Discovery may not be complete at that time. Indeed, until a punitive damages claim is stated, discovery on some issues may not have begun. (See § 2017, subd. (a); Civ. Code, § 3295, subd. (c).) In apparent recognition of this fact, section 425.13(a) does not contemplate a minitrial in which witness testimony is introduced. As we have seen, a section 425.13(a) motion, like a motion for summary judgment, is decided entirely on an "affidavit" showing.

As indicated in *Central Pathology, supra*, 3 Cal.4th 181, section 425.13(a) was enacted amid concern over routine inclusion of sham punitive damage claims in medical malpractice actions. The statute apparently seeks to alleviate this problem by shifting to the plaintiff the procedural burden that would otherwise fall on the defendant to remove a "frivolous" or "unsubstantiated" claim early in the suit. (3 Cal.4th at pp. 189, 191.)

Repeated references to section 425.13(a) appear in the legislative record of other statutes that were patterned upon it. Using similar terminology, these statutes seek to limit the pleadability of punitive, and even compensatory, causes of action under particular circumstances. The meaning of these other provisions is not technically before us, but we examine their history because it sheds light on the Legislature's intent with regard to section 425.13(a).

Section 425.14 restricts the pleading of punitive damage claims against religious corporations by requiring the plaintiff to first "substantiate" the

claim. It was enacted the year after section 425.13(a) became law. (Stats. 1988, ch. 1410, § 1, pp. 4778-4779; see Legis. Counsel's Dig., Sen. Bill No. 1, 4 Stats. 1988 (Reg. Sess.) Summary Dig., p. 489.) The letter transmitting the bill to the Governor for approval analogized section 425.14 to section 425.13(a), and described both provisions as providing "procedural protection" against "frivolous" claims while "allow[ing] legitimate claims to be made." (Request for Signature Letter to Governor, from Sen. Com. Chairman John T. Doolittle, Sen. Bill No. 1 (1987-1988 Reg. Sess.) pp. 1-2.) Earlier, during the Assembly's consideration of section 425.14, the bill was said to establish "essentially the same mechanism for pleading punitive damages" as section 425.13(a). Both provisions were intended to prevent the "automatic filing" of punitive damage claims not supported by "substantive proof." (Assem. Judiciary Com., Analysis of Sen. Bill No. 1 (1987-1988 Reg. Sess.) as amended Jan. 26, 1988, p. 1.)

In the same session, the Legislature added section 1714.10 to the Civil Code. (Stats. 1988, ch. 1052, § 1, pp. 3407-3408.) Using language nearly identical to section 425.13(a), it requires plaintiffs to demonstrate a "reasonable probability" of success before charging an attorney with conspiracy during the course of representing a client. Both houses of the Legislature expressed concern over use of such claims as a tactical ploy, particularly in actions against insurance companies. The proposed legislation was described as a means of curbing such "abuses" while not "unfairly depriv[ing] plaintiffs of legitimate conspiracy claims." (Sen. Com. on Judiciary, 3d reading analysis of Sen. Bill No. 2337 (1987-1988 Reg. Sess.) as amended August 9, 1988, p. 2; Assem. Subcom. on Admin. of Justice, Analysis of Sen Bill No. 2337 (1987-1988 Reg. Sess.) as amended May 11, 1988, p. 3.) One report recognized that motions for summary judgment were available to the defense as a means of defeating "frivolous" conspiracy claims. However, the report questioned whether such motions provided "adequate" procedural protection. (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 2337 (1987-1988 Reg. Sess.), Hearing on May 3, 1988, p. 4.)

Similar concerns surfaced in conjunction with sections 425.15 and 425.16, which were enacted as part of the same Senate bill in 1992. (Stats. 1992, ch. 726, §§ 1-2, pp. 1-4.) Section 425.15 prevents plaintiffs from filing negligence claims against certain nonprofit executives absent evidence "substantiat[ing]" the claim. Section 425.16 requires a "probability" of success as a precondition to maintaining so-called "SLAPP" suits. A Senate report indicated that both provisions were based on the need to "screen out meritless cases at an early stage." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1264 (1991-1992 Reg. Sess.) p. 5.) The same report (*ibid.*) also stated that "[c]urrent uses of the pleading hurdle" could be found in sections 425.13(a) and 425.14, and Civil Code section 1714.10.

 Nothing in the foregoing materials indicates that under statutes like section 425.13(a), trial courts are authorized to weigh the merits of the claim or consider its likely outcome at trial. Although such terms as "frivolous" and "meritless" are not explicitly defined, the tone and substance of the debate strongly suggest that the motion required by such statutes operates like a demurrer or motion for summary judgment in "reverse." Rather than requiring the *defendant* to defeat the plaintiff's pleading by showing it is legally or factually meritless, the motion requires the *plaintiff* to demonstrate that he possesses a legally sufficient claim which is "substantiated," that is, supported by competent, admissible evidence.

Indeed, the Hospital's contrary interpretation of section 425.13(a) has grave implications. As we understand this view, a legally sufficient, factually supported punitive damages claim could be withheld from consideration by the trier of fact if the court independently concluded that the probability the claim would succeed at trial was not sufficiently high. We know of no other provision of law that empowers trial courts to "trump" the fact-finding process in this manner. If such an unusual and drastic result was intended by section 425.13(a), we would expect the Legislature to make that purpose abundantly clear. It did not do so.

Thus, the gravamen of section 425.13(a) is that the plaintiff may not amend the complaint to include a punitive damages claim unless he both states and substantiates a legally sufficient claim. In other words, the court must deny the section 425.13(a) motion where the facts asserted in the proposed amended complaint are legally insufficient to support a punitive damages claim. (See §§ 430.10, 436-437.) The court also must deny the motion where the evidence provided in the "supporting and opposing affidavits" either negates or fails to reveal the actual existence of a triable claim. (See § 437c, subd. (c).) The section 425.13(a) motion may be granted only where the plaintiff demonstrates that both requirements are met.[5] This test is largely consistent with the "prima facie" approach formulated by the Courts of Appeal.[6]

Moreover, in light of the "affidavit" requirement and by analogy to summary judgment practice, substantiation of a proposed punitive damages

---

[5] Of course, a situation might arise in which the proposed amended complaint, viewed in isolation, makes legally insufficient allegations, but the missing elements can be deduced from supporting materials such as the affidavits in support of the motion. By analogy to the procedures which apply to demurrers, motions for summary judgment, and motions for judgment on the pleadings, the trial court should not deny the motion outright on grounds of legal insufficiency, but should allow an opportunity to amend the complaint to include the missing allegations. (See, e.g., *Kirby* v. *Albert D. Seeno Construction Co.* (1992) 11 Cal.App.4th 1059, 1067-1070 [14 Cal.Rptr.2d 604]; *Williams* v. *Braslow* (1986) 179 Cal.App.3d 762, 774 [224 Cal.Rptr. 895].)

[6] Cases construing section 425.13(a) and similar statutes conclude, as we do, that the Legislature did not authorize law and motion courts to weigh evidence or predict the likely

claim occurs only where the factual recitals are made under penalty of perjury and set forth competent admissible evidence within the personal knowledge of the declarant. (See §§ 437c, subds. (b) & (d), 2015.5.) Consistent with the legislative intent to protect health care defendants from the drastic effects of unwarranted punitive damage claims, the entire package of materials submitted in support of the section 425.13(a) motion should be carefully reviewed to ensure that a genuine contestable claim is indeed proposed.[7]

The parties and amici curiae vigorously debate whether there is a state constitutional right to jury trial on a "triable" punitive damages claim (see Cal. Const., art. I, § 16), and whether section 425.13(a) interferes with such right. However, for reasons stated above, the statute does not alter the traditional role of the trier of fact with respect to punitive damage claims against health care providers. (See Evid. Code, § 312 [jury decides questions of fact].) As we interpret the statute, therefore, it does not implicate any jury trial concerns. (Accord, *Bank of America, etc.* v. *Oil Well S. Co.* (1936) 12

outcome at a trial before allowing plaintiffs to plead their claims. The Courts of Appeal have held that such statutes operate much like a demurrer and summary judgment in reverse, placing the burden on the plaintiff to present a "legally sufficient" claim and to undergo a procedure like the one "employed in the determination of a motion for summary judgment." (*Hung* v. *Wang, supra,* 8 Cal.App.4th 908, 931; accord, *Aquino* v. *Superior Court, supra,* 21 Cal.App.4th 847, 853-856; *Looney* v. *Superior Court, supra,* 16 Cal.App.4th 521, 538-539; *Rowe* v. *Superior Court, supra,* 15 Cal.App.4th 1711, 1723-1724.) Despite this reliance on summary judgment principles, and for reasons not made clear, these cases do not discuss section 425.13(a) in terms of the familiar "triable" issue standard. Instead, *Hung* and its progeny articulated their own ad hoc standard for assessing evidence submitted under section 425.13(a)—whether there is a "sufficient prima facie showing of facts to sustain a favorable decision if the evidence submitted by the petitioner is credited." (*Hung, supra,* 8 Cal.App.4th at p. 931.) As far as we can discern, there is little substantive difference between this approach and the one we articulate. Under either formulation, a motion to amend the complaint to state a punitive damages claim under section 425.13(a) must be granted unless, after reviewing the supporting and opposing materials, the court concludes that the allegations made or the evidence adduced in support of the claim, even if credited, are insufficient as a matter of law to support a judgment for punitive damages.

[7]It is generally understood, for instance, that a party cannot rely on the allegations of his own pleadings, even if verified, to make or supplement the evidentiary showing required in the summary judgment context. (*Parker* v. *Twentieth Century Fox-Film Corp.* (1970) 3 Cal.3d 176, 181 [89 Cal.Rptr. 737, 474 P.2d 689, 44 A.L.R.3d 615]; *Coyne* v. *Krempels* (1950) 36 Cal.2d 257, 262 [223 P.2d 244]; *Orsetti* v. *City of Fremont* (1978) 80 Cal.App.3d 961, 966 [146 Cal.Rptr. 75]; 2 Cal. Civil Procedure Before Trial (Cont.Ed.Bar 1993) § 43.13, p. 43-10; Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 1994) ¶ 10:19, p. 10-6.) The basic purpose of summary judgment is to provide a means by which the court determines whether "the triable issues apparently raised by [the complaint and answer] are real or merely the product of adept pleading." (*Coyne* v. *Krempels, supra,* 36 Cal.2d at p. 262.) Hence, the moving party must demonstrate the presence or absence of a genuine triable issue by "affidavit" or other competent means. (§ 437c, subds. (b), (c) & (d).) A similar "affidavit" showing must accompany the plaintiff's motion to amend the complaint under section 425.13(a).

Cal.App.2d 265, 270 [55 P.2d 885] [summary judgment procedure].) Because resolution of the constitutional question is not necessary to our decision, we do not address it. (*De Lancie* v. *Superior Court* (1982) 31 Cal.3d 865, 877, fn. 13 [183 Cal.Rptr. 866, 647 P.2d 142]; *People* v. *Williams* (1976) 16 Cal.3d 663, 667 [128 Cal.Rptr. 888, 547 P.2d 1000].)

## D. *"Malice" Under Civil Code Section 3294*

The next question is whether plaintiffs have stated and demonstrated a triable punitive damages claim under section 425.13(a).

The basic elements of such claims are set forth in Civil Code section 3294. As previously stated, there must be proof of "oppression, fraud, or malice." (*Id.*, subd. (a).)[8] Moreover, the punishable acts which fall into these categories are strictly defined. Each involves "intentional," "willful," or "conscious" wrongdoing of a "despicable" or "injur[ious]" nature. (*Id.*, subd. (c).)[9]

Civil Code section 3294, subdivision (b) imposes additional requirements on plaintiffs attempting to hold an "employer" liable for punitive damages "based upon acts of an employee." The employer must have "had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or [been] personally guilty of oppression, fraud, or malice." (*Ibid.*) Subdivision (b) also states that, "[w]ith respect to a corporate employer," the offending conduct "must be on the part of an officer, director, or managing agent of the corporation." (*Ibid.*) The statute does not purport to exclude any particular type of employer, such as health care providers, from its coverage.

We will independently review the proposed amended complaint and the evidence submitted in support of and in opposition to the motion under

---

[8]Civil Code section 3294, subdivision (a) states, in full: "In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant."

[9]Civil Code section 3294, subdivision (c) contains the following definitions: "(1) 'Malice' means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others. [¶] (2) 'Oppression' means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights. [¶] (3) 'Fraud' means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury."

section 425.13(a) to determine whether plaintiffs have stated and substantiated a legally sufficient punitive damages claim against the Hospital. (Cf. *Ann M.* v. *Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 673-674 [25 Cal.Rptr.2d 137, 863 P.2d 207]; *Aubry* v. *Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 966-967 [9 Cal.Rptr.2d 92, 831 P.2d 317].) Even if we view the evidence in a light most favorable to plaintiffs, it is clear they have not met the requirements of section 425.13(a).

### 1. *Berry.*

The proposed amended complaint alleges the following facts. Berry met Laura at the Hospital where he worked in the cardiopulmonary unit. To further "his own personal interests," Berry courted Laura and tried to become involved in her treatment in unspecified ways. Laura became emotionally attached to Berry and succumbed to his requests for sex, money, and gifts. Laura suffered great distress when Berry ended the relationship. The proposed amended complaint also states that Berry had engaged in a prior sexual relationship with another "hospital patient." His conduct towards Laura allegedly occurred within the "course and scope of his employment."

Evidence submitted in support of these allegations under section 425.13(a) consists primarily of Laura's declaration and describes Berry's conduct as follows. Berry was the Hospital's director of cardiopulmonary services. His office was located near the psychotherapy unit. He approached Laura in the Hospital shortly after her admission in June 1990 and expressed a personal interest in her condition. He stated that he was not a psychotherapist but that he had read her chart and could help treat her agoraphobia and other problems. Berry and Laura began socializing outside the Hospital and practiced the relaxation and "desensitization" exercises she learned in therapy, such as driving on freeways and visiting shopping malls. During these trips, Berry solicited cash and gifts totaling about $8,000 from Laura. The pair became sexually intimate and discussed marriage. In December 1990, Berry ended the relationship. Laura became distraught and required hospitalization.[10]

Plaintiffs contend that punitive damages can be assessed against the Hospital under Civil Code section 3294, subdivision (b) because Berry was an "officer, director, or managing agent" who "personally" committed malicious acts while Laura was a patient. The Hospital and its amici curiae

---

[10]In deposition testimony submitted in opposition to the section 425.13(a) motion, Berry denied reading Laura's chart or exploiting her in any way. Other Hospital employees indicated in their deposition testimony that Berry had no access to her locked confidential files.

argue that Berry's position in the corporate hierarchy was not that of an "officer, director, or managing agent" under the statute. We need not resolve this dispute because plaintiffs' theory necessarily fails for another reason.

California has traditionally allowed punitive damages to be assessed against an employer (or principal) for the acts of an employee (or agent) only where the circumstances indicate that the employer himself was guilty of fraud, oppression, or malice. Thus, even before section 3294, subdivision (b) was added to the Civil Code in 1980, the courts required evidence that the employer authorized or ratified a malicious act, personally committed such an act, or wrongfully hired or retained an unfit employee. For corporate or other large organizations, such conduct must have been performed by an " 'agent . . . employed *in a managerial capacity* and . . . *acting in the scope of employment*,' " or ratified or approved by a " 'managerial agent' " of the organization. (*Egan* v. *Mutual of Omaha Ins. Co., supra,* 24 Cal.3d 809, 822 (*Egan*), quoting Rest.2d Torts, § 909, italics added; see also *Deevy* v. *Tassi* (1942) 21 Cal.2d 109, 125 [130 P.2d 389]; *Warner* v. *Southern Pacific Co.* (1896) 113 Cal. 105, 111-112 [45 P. 187]; *Merlo* v. *Standard Life & Acc. Ins. Co.* (1976) 59 Cal.App.3d 5, 18 [130 Cal.Rptr. 416]; *Ebaugh* v. *Rabkin* (1972) 22 Cal.App.3d 891, 896 [99 Cal.Rptr. 706]; *McChristian* v. *Popkin* (1946) 75 Cal.App.2d 249, 256-257 [171 P.2d 85]; 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, §§ 1344-1346, pp. 807-808.) The obvious point is that in performing, ratifying, or approving the malicious conduct, the agent must be acting *as the organization's representative*, not in some other capacity.

The Hospital and its amici curiae argue that Civil Code section 3294, subdivision (b) abrogated *Egan* insofar as that case applied the "managing agent" concept to rank-and-file employees in whom the corporation has vested substantial "discretion." (24 Cal.3d 809, 822-823 [punitive damages imposed on insurer for malicious settlement practices by claims adjusters].) But whatever the meaning of "managing agent" under pre- or poststatutory law, the concept assumes that such individual was *acting in a corporate or employment capacity* when the conduct giving rise to the punitive damages claim against the employer occurred. (See, e.g., *Pusateri* v. *E. F. Hutton & Co.* (1986) 180 Cal.App.3d 247, 253-255 [225 Cal.Rptr. 526] [branch manager fails to intervene in stockbroker's known flagrant mishandling of account]; *Grimshaw* v. *Ford Motor Co.* (1981) 119 Cal.App.3d 757, 812-814 [174 Cal.Rptr. 348] [auto executives fail to correct known potentially lethal design defect in car]; *Nolin* v. *National Convenience Stores, Inc.* (1979) 95 Cal.App.3d 279, 288-289 [157 Cal.Rptr. 32] [store supervisor refuses to correct known highly dangerous condition on premises]; *Hartman* v. *Shell Oil Co.* (1977) 68 Cal.App.3d 240, 248-250 [137 Cal.Rptr. 244] [oil company representatives commit fraud against service station operator].) No

purpose would be served by punishing the employer for an employee's conduct that is wholly unrelated to its business or to the employee's duties therein. We cannot conceive that Civil Code section 3294, subdivision (b) intended such a result.[11]

Contrary to conclusory allegations in the proposed amended complaint, the "scope-of-employment" element is missing from plaintiffs' case. The only inference that can be drawn from the proposed factual allegations and from the evidence submitted under section 425.13(a) is that Berry was acting in his personal capacity and for his own private benefit when he allegedly exploited Laura. The pertinent allegations and evidence suggest at most that Berry, a cardiopulmonary supervisor, engaged in a consensual, off-premises sexual affair with an adult patient not under his care. The mere fact that the couple met at the Hospital or that Berry purported to take a personal interest in Laura's therapy is insufficient as a matter of law to establish that Berry was acting as a corporate representative or in a professional capacity. Thus, whether or not Berry qualifies as a "managing agent," plaintiffs have failed to state or substantiate a punitive damages claim against the Hospital based on his conduct under section 425.13(a) and Civil Code section 3294, subdivision (b).

### 2. Westbrook.

The proposed amended complaint identifies Westbrook as the Hospital administrator "ultimately responsible" for Laura's care. It alleges that Westbrook knew or should have known about the relationship between Berry and Laura and about Berry's prior sexual relationship with another patient. Fairly understood, the allegations in the proposed amended complaint charge that Westbrook approved or tolerated Berry's relationship with Laura by failing to adequately investigate the matter or discipline Berry.

Evidence submitted under section 425.13(a) concerning Westbrook consists primarily of excerpts from his deposition testimony. These materials were included in plaintiffs' reply papers, and suggest the following about Westbrook's involvement. In the fall of 1990, Westbrook, the chief administrator of the Hospital, heard "third hand" that a relationship might have

---

[11]Even under the respondeat superior doctrine applicable to *compensatory* damages, an employer is vicariously liable for such damages only where the employee was acting within the scope of employment. (*Mary M.* v. *City of Los Angeles* (1991) 54 Cal.3d 202, 208-209 [285 Cal.Rptr. 99, 814 P.2d 1341].) Of course, liability for compensatory damages is imposed on even "innocent" employers as a foreseeable and insurable cost of doing business. (*Hinman* v. *Westinghouse Elec. Co.* (1970) 2 Cal.3d 956, 959-960 [88 Cal.Rptr. 188, 471 P.2d 988]; *Johnston* v. *Long* (1947) 30 Cal.2d 54, 64 [181 P.2d 645].) As previously indicated, however, *punitive* damages are not assessed against employers on a pure respondeat superior basis. Some evidence of fault by the employer itself is also required.

developed between Laura and Berry—something "more than just a patient passing an individual in the hallway." The information was given to Westbrook by an assistant administrator, who apparently attributed it to members of Laura's treatment team. Westbrook promptly confronted Berry with the rumor. Berry seemed shocked by the information and adamantly denied any personal contact with Laura. Westbrook advised Berry that the organization expected "certain behavior" of its managers and that anything other than a casual relationship with a patient "might be perceived" as "questionable." Westbrook took no further action in the matter.

Plaintiffs argue that punitive damages are appropriate against the Hospital under Civil Code section 3294, subdivision (b) because Westbrook personally exhibited malice towards plaintiffs in performing his managerial duties. They imply that any personal contact between a therapy patient and a hospital employee is *presumptively* harmful and that Westbrook's acceptance of Berry's denial without further investigation was *inherently* malicious.

Such an approach overlooks the plain language of Civil Code section 3294. "Malice" is defined as conduct "intended by the defendant to cause injury to the plaintiff," or "*despicable* conduct which is carried on by the defendant with a *willful* and conscious disregard of the rights or safety of others." (*Id.*, § 3294, subd. (c)(1).) As noted earlier, the italicized words were added by the 1987 Reform Act. We assume they are not surplusage. (*Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224].)

By adding the word "willful" to the "conscious-disregard" prong of malice, the Legislature has arguably conformed the literal words of the statute to existing case law formulations. (See *Taylor* v. *Superior Court*, *supra*, 24 Cal.3d 890, 895-896 [malice involves awareness of dangerous consequences and a willful and deliberate failure to avoid them].) However, the statute's reference to "despicable" conduct seems to represent a new substantive limitation on punitive damage awards. Used in its ordinary sense, the adjective "despicable" is a powerful term that refers to circumstances that are "base," "vile," or "contemptible." (4 Oxford English Dict. (2d ed. 1989) p. 529.) As amended to include this word, the statute plainly indicates that absent an intent to injure the plaintiff, "malice" requires more than a "willful and conscious" disregard of the plaintiffs' interests. The additional component of "despicable conduct" must be found. (Accord, BAJI No. 14.72.1 (1992 re-rev.); *Mock* v. *Michigan Millers Mutual Ins. Co.* (1992) 4 Cal.App.4th 306, 331 [5 Cal.Rptr.2d 594].)

As a matter of law, plaintiffs have not established malicious conduct by Westbrook. The proposed amended complaint and the evidence

submitted under section 425.13(a) do not show Westbrook knew or possessed information indicating that Berry was engaged in harmful activities towards plaintiffs. Specifically, such materials do not show that Westbrook was aware that the rumored relationship between Berry and Laura was sexual or destructive, that Berry had been involved in a prior relationship with a patient (destructive or otherwise), or that Berry lied when confronted with the rumor about Laura. As a result, plaintiffs have necessarily failed to state or demonstrate that Westbrook intended to injure plaintiffs or willfully disregarded their safety and well-being by accepting Berry's denial. For similar reasons, no vile or "despicable" conduct by Westbrook appears from the face of the proposed complaint or the evidence before us.

Plaintiffs also have not established that Westbrook "ratified" Berry's conduct under Civil Code section 3294, subdivision (b). ▮ For purposes of determining an employer's liability for punitive damages, ratification generally occurs where, under the particular circumstances, the employer demonstrates an intent to adopt or approve oppressive, fraudulent, or malicious behavior by an employee in the performance of his job duties.

The issue commonly arises where the employer or its managing agent is charged with failing to intercede in a known pattern of workplace abuse, or failing to investigate or discipline the errant employee once such misconduct became known. (See, e.g., *Roberts* v. *Ford Aerospace & Communications Corp.* (1990) 224 Cal.App.3d 793, 800-801 [274 Cal.Rptr. 139] [management knows Black employee is racially abused by colleagues at work and fires him after he complains]; *Hart* v. *National Mortgage & Land Co.* (1987) 189 Cal.App.3d 1420, 1432-1433 [235 Cal.Rptr. 68] [management fails to stop known on-the-job sexual harassment of employee by coworkers]; *Greenfield* v. *Spectrum Investment Corp.* (1985) 174 Cal.App.3d 111, 118-121 [219 Cal.Rptr. 805], overruled on other grounds in *Lakin* v. *Watkins Associated Industries* (1993) 6 Cal.4th 644, 664 [25 Cal.Rptr.2d 109, 863 P.2d 179] [employee is retained even though management knows about his violent temper and assault upon a customer at work]; *Hale* v. *Farmers Ins. Exch.* (1974) 42 Cal.App.3d 681, 691-692 [117 Cal.Rptr. 146] , overruled on other grounds in *Egan, supra,* 24 Cal.3d 809, 822, fn. 5 [insurer directs, reviews, and approves malicious claims settlement practices]; *Schanafelt* v. *Seaboard Finance Co.* (1951) 108 Cal.App.2d 420, 423-424 [239 P.2d 42] [employee follows finance company's directions and falsely imprisons pregnant customer while collecting on delinquent loan].) Corporate ratification in the punitive damages context requires actual knowledge of the conduct and its outrageous nature.

▮ Under no view of the proposed amended complaint or the evidence submitted under section 425.13(a) can Westbrook's conduct be characterized

as ratification. As noted above, plaintiffs have presented no evidence that Westbrook knew about the relationship's allegedly sexual or harmful nature. Berry denied any contact with Laura, and there is no indication that Westbrook had personal knowledge to the contrary. By cautioning Berry against patient involvement, Westbrook attempted to repudiate—not adopt—such conduct on the Hospital's behalf. Thus, as a matter of law, plaintiffs have failed to state or substantiate a claim that Westbrook knowingly approved Berry's "manipulative" relationship with Laura. Accordingly, as with Berry, no basis appears for assessing punitive damages against the Hospital based on malicious or oppressive acts of its employees.[12]

## DISPOSITION

In light of the foregoing, plaintiffs failed to satisfy the requirements of section 425.13(a) when they sought to plead a punitive damages claim against the Hospital. The Court of Appeal erred in denying the Hospital's petition for a writ of mandate to set aside the order allowing plaintiffs to state such a claim. The judgment of the Court of Appeal is therefore reversed. The matter is remanded to the Court of Appeal with directions to issue a peremptory writ of mandate instructing the trial court to vacate its order granting plaintiffs leave to amend their complaint and instructing it to conduct further proceedings not inconsistent with the views expressed herein.

Lucas, C. J., Mosk, J., Kennard, J., Arabian, J., George, J., and Werdegar, J., concurred.

On November 23, 1994, the opinion was modified to read as printed above.

---

[12]Amicus curiae's arguments made on plaintiffs' behalf suggest that punitive damages can be sought against the Hospital under Civil Code section 3294, subdivision (b) based on the conduct of its therapists. It is alleged that the therapists were "managing agents" of the Hospital who, while acting in a professional capacity, tolerated, encouraged, or ratified Laura's relationship with Berry despite its destructive nature or potential.

This issue is not presented by the case. No punitive damages claim was stated against the therapists in either the original or proposed amended complaints, nor were they charged with malicious or outrageous conduct therein. Plaintiffs did not cite the therapists' conduct as a basis for seeking punitive damages against the Hospital in written or oral arguments in the trial court. Although a fleeting reference to therapeutic "ratification" of Berry's conduct was made in plaintiffs' return to the alternative writ in the Court of Appeal, the court did not discuss the point in its opinion. Plaintiffs did not seek rehearing or otherwise challenge the omission. Finally, plaintiffs do not argue in their briefs in this court that the Hospital is liable for punitive damages based on the therapists' conduct. Under the circumstances, the question whether the section 425.13(a) motion should have been granted on this basis is not properly before us and we do not address it.